UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CORINNA MCGREGOR, | CASE NO. C17-5436 RBL |
| Plaintiff, | |
| v. | ORDER ON MOTION FOR SUMMARY JUDGMENT |
| KITSAP COUNTY, et al., | |
| Defendants. | |

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment Regarding Qualified Immunity [Dkt. #33]. In June 2014, Kitsap County Sheriff's Deputies responded to a 911 call from Plaintiff Corinna McGregor's then-husband reporting that McGregor was suicidal. Deputies observed McGregor, who was armed with a handgun, exit her home and walk behind a nearby woodpile in her backyard. McGregor was shot by Deputy Wilson Sapp during the ensuing standoff. The parties disagree about whether McGregor was armed at the time Deputy Sapp shot her. McGregor survived the encounter and now brings suit alleging various torts and constitutional violations against Kitsap County and Deputy Sapp. Defendants move for summary judgment on McGregor's excessive force claim against Deputy Sapp, arguing that Sapp is protected by qualified immunity. Defendants also move for summary

judgment on McGregor's *Monell* claim against Kitsap County, asserting that McGregor cannot establish a constitutional violation for which Kitsap County is liable. The Court would not be aided by oral argument and decides the motion on the parties' written submissions.

## I. BACKGROUND

On the evening of June 9, 2014, Riley Barth, the Plaintiff's ex-husband, called 911 to report a domestic disturbance involving his then-wife, Corinna McGregor. Barth reported that McGregor was suicidal, prompting a response from Kitsap County Sheriff's Deputies. Deputy Rob Corn was the first officer to respond to the Barth-McGregor residence and spoke with Barth in the driveway. Barth reported that he had been in a verbal dispute with his wife, and that McGregor had been acting irrationally since discontinuing medications to treat her mental illness. Barth also advised Deputy Corn that McGregor had been committed for psychiatric problems in the past, had previously threatened suicide, and may have access to firearms inside the residence.

Deputy Ben Herrin arrived at the Barth-McGregor residence and approached the front door on foot with Deputy Corn. Corn briefly spoke with McGregor through the front door. When Corn requested that McGregor speak to him through an open window, McGregor suggested that they could speak at the sliding glass door at the side of the house. When Corn arrived at the side door, he saw McGregor armed with a black semi-automatic pistol. Corn quickly retreated from the side door and advised Deputy Herrin that McGregor was armed and to take cover. The deputies repositioned their patrol cars in front of the house to provide additional cover. Deputies Wilson Sapp,[1] Greg Rice, and John Stacy arrived shortly thereafter.[2] Deputy Stacy approached

---

[1] The record is inconsistent as to the precise timing of Deputy's Sapp's arrival. *See* Dkt. 45.

[2] The record suggests that Deputy Johnson, who was specially trained in crisis negotiation, was en route to the scene but did not arrive prior to McGregor being shot.

1   the Barth-McGregor residence via a neighbor's property to the south to secure a better view of

2   the backyard.

3        Still armed with the handgun, McGregor exited the house through the side door and

4   walked into the backyard positioning herself behind a stack of firewood at the southwest corner

5   of the property. Deputy Herrin used the PA system on his patrol car to instruct McGregor to

6   come to the front of the house with her hands visible. McGregor shouted an inaudible response.

7   Shortly thereafter, McGregor fired a test-shot from the handgun into the ground by the woodpile.

8   Fearing that McGregor had shot herself, deputies approached the woodpile behind the cover of a

9   ballistic shield. As the deputies approached, they observed that McGregor was apparently

10  unharmed and still armed with the handgun. The deputies retreated back to the front of the house,

11  taking containment positions behind a patrol car and some large trees. Deputy Sapp, armed with

12  an assault rifle, was positioned behind a large fir tree near the front of the residence

13  approximately 114 feet away from McGregor and the woodpile.

14       Deputy Corn again used his patrol car's PA system to request that McGregor come out

15  from behind the woodpile unarmed. McGregor responded that she was going to kill herself, told

16  the officers to leave her alone, and then demanded to speak to her husband. Eventually,

17  McGregor emerged from behind the woodpile. The parties agree that soon after emerging,

18  Deputy Sapp fired a single shot striking McGregor in the abdomen and causing her to collapse in

19  front of the woodpile. Of significance to this lawsuit, the parties dispute whether or not

20  McGregor was holding the handgun when she was shot.

21       According to McGregor, the deputies promised her that she would be allowed to speak to

22  her husband if she came out from behind the woodpile unarmed. Relying on these assurances,

23  McGregor asserts that she set the gun down and slowly emerged from behind the woodpile

24

holding only a bright pink e-cigarette in her hand. Dkt. 39 at 2–4. McGregor contends that she

was shot without warning and denies ever waving or pointing a gun in the direction of the

deputies. *Id*. at 4–6.

Defendants assert that immediately prior to being shot, McGregor emerged from behind

the woodpile intermittently shouting, waving the handgun around, pointing the gun at her own

head, and pointing the gun at deputies.[3] Dkt. 33; Dkt. 35. Several of the deputies acknowledge

having an obstructed view of McGregor. Deputy Sapp contends that he was in fear for his own

safety as well as the safety of his fellow officers and the occupants of nearby homes when he

shot McGregor. Dkt. 34. Deputies Sapp, Corn, and Herrin contend that McGregor dropped the

handgun only after she was shot, however Deputy Stacy, the lone officer positioned to the south,

reported that the object McGregor dropped was the e-cigarette. Dkt. 35.

McGregor was promptly transported to the hospital and survived the encounter. She now

brings suit against Kitsap County and Deputy Sapp alleging tort and constitutional violations.

The Court previously dismissed the current and former Kitsap County Sheriffs as defendants

from the suit as well as McGregor's negligent hiring, training, and supervision claim. *See* Dkt.

31.

## II. LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

---

[3] Deputy Sapp asserts that McGregor emerged from behind the woodpile with "a handgun in her hand . . . . She began waving the gun around and it appeared the barrel was pointed at me twice . . . . She dropped the gun back down to her side for a few moments then began pointing it in various directions, including back toward myself and other deputies." Dkt. 34 at 6.

an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

### III. DISCUSSION

Defendants move for summary judgment on McGregor's excessive force claim against Deputy Sapp and on McGregor's *Monell* claim against Kitsap County.[4] Defendants contend Deputy Sapp is entitled to qualified immunity with respect to the excessive force claim because

---

[4] Defendants do not seek summary judgment on McGregor's negligence claim against Deputy Sapp or on her *respondeat superior* claim against Kitsap County, which remain to be resolved at trial.

his use of deadly force against McGregor was objectively reasonable under the circumstances. Dkt. 33 at 2. Defendants also seek summary judgment on McGregor's *Monell* claim, arguing that it is derivative of her excessive force claim, and that McGregor cannot establish an underlying constitutional violation which would give rise to *Monell* liability against Kitsap County. *Id*. McGregor contends that there are genuine issues of material fact surrounding all of the events which preclude granting Defendants' motion for summary judgment on both the excessive force and *Monell* claims.

**A. Deputy Sapp is not entitled to qualified immunity.**

Defendants argue Deputy Sapp is "immune from suit under the doctrine of qualified immunity because his conduct was objectively reasonable and within the bounds of the constitution when he responded to an imminent threat of deadly force with deadly force." Dkt. 33 at 2. Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has endorsed a two-part test to resolve claims of qualified immunity: a court must decide (1) whether the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).[5] Qualified immunity protects officers not just from liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and thus, the claim should be resolved "at the earliest possible stage in litigation." *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987). The purpose of qualified immunity is "to recognize

---

[5] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier* requiring district courts to decide each question in order.

that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

    1. <u>McGregor alleges facts that if true, establish a violation of her Fourth Amendment right to be free from unreasonable seizure.</u>

    The Court must determine whether McGregor's allegations, if true, establish a constitutional violation. McGregor alleges that Deputy Sapp unreasonably seized her in violation of the Fourth Amendment by using excessive force, namely, shooting her with an assault rifle when she emerged from behind the woodpile unarmed. Dkt. 39 at 3–4. Deputy Sapp asserts his use of deadly force was objectively reasonable under the circumstances. Dkt. 33 at 10–12.

    "Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement." *Wilkinson v. Torres*, 610 F.3d 546, 550 (2010) (citing *Graham v. Conner*, 490 U.S. 386, 395 (1989)). The reasonableness of force is determined by "carefully balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 396). Courts assess the "quantum of force used to arrest" by considering "the type and amount of force inflicted." *Id.* at 1279–80. A court assesses the reasonableness of the force used by considering a range of factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Wilkinson*, 610 F.3d at 550 (citing *Graham*, 490 U.S. at 396). Where an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," the officer may constitutionally use deadly force. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)).

Importantly, a court must judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Wilkinson*, 610 F.3d at 550. Courts are cautioned to make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (citing *Graham*, 490 U.S. at 396–97). And, although the question is "highly fact-specific," the inquiry is objective: a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 551 (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007); *Graham*, 490 U.S. at 397).

Here, the quantum of force used (shooting McGregor with an assault rifle) amounts to a severe intrusion on McGregor's Fourth Amendment rights. The Court balances this intrusion with the government's countervailing interest in seizing McGregor. Deputies were initially summoned to the Barth-McGregor residence in response to a report that McGregor was suicidal, not to investigate criminal conduct. Defendants concede that the severity of the crime at issue was low. Dkt. 42 at 8. Defendants also concede that force was not necessary to prevent McGregor from fleeing. *Id.* at 9. Indeed, she remained seated behind the woodpile for most of the encounter. Perhaps the most significant consideration to judge the reasonableness of Deputy Sapp's use of deadly force is whether McGregor posed an immediate threat to the safety of the deputies or to others. There is little doubt that McGregor posed a danger to herself. But whether McGregor also posed a danger to the deputies is less clear. Defendants assert that Deputy Sapp "was compelled to use force to save his own life and the lives of others." *Id.* at 9. But "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. Deputy Sapp's

argument that deadly force was objectively reasonable relies on Defendants' version of disputed facts. Defendants' presuppose that McGregor was indeed armed with a gun when she emerged from behind the woodpile, and that she pointed the gun at the deputies, placing them in imminent danger.

At summary judgment, however, the Court must view the evidence in the light most favorable to McGregor as the nonmoving party. McGregor presents testimony that she discarded the handgun and emerged from behind the woodpile unarmed, as ordered by Deputy Corn.[6] The record also suggests that McGregor was contained, that deputies were aware that McGregor was suicidal and had a history of mental illness, that there was substantial distance (114 feet) and cover between McGregor and the officers limiting any potential threat, that she was not warned prior to the use of deadly force, and that a deputy trained in crisis negotiation was en route. The Court cannot determine as a matter of law that Deputy Sapp's decision to shoot an unarmed, suicidal person in the midst of a mental health crisis from 114 feet away was objectively reasonable, especially when the deputies might have chosen not to engage Plaintiff while awaiting the arrival of a trained negotiator.[7] If the situation was as Plaintiff presents it, there was

---

[6] Defendants' argument that Plaintiff cannot support her version of events with admissible evidence is without merit. McGregor's account of the situation is based upon her own personal knowledge. McGregor also relies on investigative reports suggesting the handgun was found behind the woodpile, bolstering her argument that she was not armed at the time she was shot by Deputy Sapp. Contrary to Defendants' interpretation of the rule against hearsay, these reports are likely admissible as evidence.

[7] "In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. . . . Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle*, 272 F.3d at 1283; *see also Glenn*, 673 F.3d 864 at 875–76.

no pressing reason for Deputy Sapp to use deadly force, and McGregor has alleged a viable excessive force claim.

2. <u>The right to be free from excessive force is clearly established.</u>

Defendants argue that even if Deputy Sapp used excessive force, he is still entitled to qualified immunity because he did not violate any clearly established rights. Defendants suggest that there is no case law that would place Deputy Sapp on notice that his use of deadly force under the particular circumstances of this case was unlawful.

As an initial matter, precedent directly on point is not necessary to demonstrate that a right is clearly established if its unlawfulness would be apparent from pre-existing case law. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Giebel v. Slyvester*, 244 F.3d 1182, 1189 (9th Cir. 2001). Despite Defendants contention that there is no case law dealing with sufficiently similar facts, "case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson*, 610 F.3d at 550 (citing *Garner*, 471 U.S. at 11). Additionally, there are decisions in this circuit putting Defendants on notice that it is unreasonable for a police officer to shoot a mentally or emotionally disturbed individual, who does not pose a flight risk or threat to others. *Deorle*, 272 F.3d at 1282–83; *Glenn v. Washington Cty.*, 673 F.3d 864, 875–76 (9th Cir. 2011).

Defendants attempt to distinguish this case from existing case law by arguing that Deputy Sapp knew that McGregor was armed and feared for the safety of himself and his fellow officers. But again, Defendants' motion for summary judgment is largely based on its own version of disputed facts. The circumstances that Defendants ask the Court to measure Deputy Sapp's conduct against are not as straightforward as Defendants suggest. Because the reasonableness of Deputy Sapp's decision to shoot McGregor depends on disputed issues of material fact, it is not a legal inquiry, but rather a question of fact best resolved by a jury. *See Wilkins v. City of Oakland*,

350 F.3d 949, 955 (9th Cir. 2003). The Court cannot conclude as a matter of law that Deputy

Sapp's belief that deadly force was warranted was reasonable under the circumstances.

Accordingly, Defendants' motion for summary judgment on McGregor's excessive force claim

against Deputy Sapp based on qualified immunity is **DENIED**.

**B. McGregor has a viable *Monell* claim against Kitsap County.**

Defendants' argument for summary judgment on McGregor's *Monell* claim is premised

on McGregor's perceived inability to establish an excessive force claim against Deputy Sapp.

Dkt. 33 at 2. Defendants also contend there is no evidence that a lack of training by Kitsap

County was the cause of the alleged constitutional deprivation. Dkt. 33 at 13–15; Dkt. 42 at 12.

To set forth a claim against a local government under § 1983, a plaintiff must show that

the defendant's employees or agents acted pursuant to an official custom, pattern, or policy that

violates the plaintiff's civil rights, or that the entity ratified the unlawful conduct. *See Monell v.

Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978); *see also Larez v. City of

Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). A municipality may be liable for a "policy of

inaction" where "such inaction amounts to a failure to protect constitutional rights." *Lee v. City

of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2000) (quoting *City of Canton, Ohio v. Harris*, 489

U.S. 378, 388 (1989)). "The inadequacy of police training may serve as the basis for section

1983 liability only where the failure to train amounts to deliberate indifference to the rights of

the persons with whom the police come into contact." *Harris*, 489 U.S. at 388. A pattern of

similar constitutional violations by untrained employees is usually necessary to establish

deliberate indifference, however, the Supreme Court has acknowledged there are limited

circumstances in which a single incident can give rise to municipal liability where the serious

consequences from the failure to train are foreseeable. *Connick v. Thompson*, 563 U.S. 51, 62–64

(2011); *Harris*, 489 U.S. at 390. Thus, to impose liability on a local government entity for failing

to act to preserve constitutional rights, a § 1983 plaintiff must allege that: (1) a municipality or its employee deprived plaintiff of a constitutional right; (2) the municipality has customs or policies that amount to deliberate indifference; and (3) those customs or policies were the "moving force" behind the constitutional right violation. *Lee*, 250 F.3d at 681–82.

Here, Defendants' argument for summary judgment primarily fails because the Court has already determined that McGregor can establish a valid claim for excessive force against Deputy Sapp. *See* Part III.A.1. Although McGregor has not demonstrated a pattern of excessive force by Kitsap County deputies against persons with mental illness, the present case falls into the narrow category where the serious consequences of failing to adequately train officers to deal with mentally unstable persons is foreseeable. *See Harris*, 489 U.S. at 390. McGregor has sufficiently alleged that Kitsap County has failed to train its deputies, and that this failure was the moving force behind the violation of McGregor's Fourth Amendment rights. Accordingly, the motion for summary judgment on McGregor's *Monell* claim is **DENIED**.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment [Dkt. #33] is **DENIED**.


IT IS SO ORDERED.

Dated this 22nd day of May, 2018.

Ronald B. Leighton
United States District Judge